UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JERPAUL D. SPENCER,

                    Plaintiff,

        v.                                          Case No. 16-cv-662-pp

EDWARD A. FLYNN, *et al.*,

                    Defendants.

**ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (DKT. NO. 119)**

Plaintiff JerPaul D. Spencer has sued under 42 U.S.C §1983 on various claims against members or former members of the Milwaukee Police Department. The defendants have moved for partial summary judgment. Dkt. No. 119. The plaintiff opposes the motion. Dkt. No. 126. The court will grant the motion.

**I.    Facts**

        A.    Procedural History

On June 6, 2016, the plaintiff—who was representing himself at the time—filed a complaint under §1983. Dkt. No. 1. On August 23, 2016, District Judge Charles N. Clevert, Jr., to whom this case previously was assigned, screened the complaint and allowed the plaintiff to proceed on Fourth Amendment claims against several Milwaukee police officers and against the Chief of the Milwaukee Police Department on a claim of municipal liability. Dkt. No. 13. On March 15, 2017, the Clerk's office reassigned the case to this court.

Just under one year later, the court resolved numerous pending motions and extended the deadline for filing dispositive motions to May 25, 2018. Dkt. No. 74.

On May 21, 2018, the plaintiff moved to compel discovery. Dkt. No. 78. The court vacated the pending dispositive motion deadline pending resolution of that motion. Dkt. No. 81. On November 8, 2018, current plaintiff's counsel filed a notice of appearance and requested a status conference. Dkt. Nos. 95, 96. On February 5, 2019, the court held a telephone status conference, during which the parties agreed to participate in mediation. Dkt. No. 102. The court referred the case to Magistrate Judge William E. Duffin for mediation, which was unsuccessful. Dkt. Nos. 105, 109. On June 13, 2019, the court held a telephone status conference, granted the plaintiff's motion to reopen discovery and scheduled a status conference for January 23, 2020. Dkt. No. 113.

Because of a scheduling issue, the court cancelled the January 23, 2020 status conference and ordered the parties to file a joint report updating the court of the status of the case. Dkt. No. 114. The parties complied; in the report, the plaintiff asked to extend the discovery deadline to allow him to conduct additional depositions. Dkt. No. 115. The defendants opposed the request. Id. The court denied the request to reopen discovery and denied the still-pending *pro se* request to compel discovery. Dkt. No. 116. The court ordered the parties to file dispositive motions by March 6, 2020. Id. After the court granted the defendants' unopposed motion to extend that deadline by

2

one week, dkt. no. 118, the defendants filed a motion for partial summary judgment, dkt. no. 119.

B.     Facts Alleged in the Complaint[1]

The plaintiff has sued former Milwaukee Chief of Police Edward A. Flynn in his individual and official capacities.[2] Dkt. No. 1 at ¶5. He also has sued current or former MPD officers Michael Vagnini, Jacob Knight, Jeffrey Cline, Paul Martinez, Gregory M. Kuspa, Jesse Busshardt, Michael Valuch and Keith Garland in their individual capacities. Id. at ¶6.

The complaint alleges that on an estimated ten to fifteen occasions between May and July 2011, MPD officers illegally stopped and searched the plaintiff without probable cause and sexually assaulted him. Dkt. No. 1 at ¶9. The plaintiff alleges that the stops and searches "were sanctioned, approved, and encouraged by MPD policy and custom, as well as Defendant Flynn himself." Id. at ¶9; see also ¶41.

1.     *The June 25, 2011 incident*

The plaintiff alleges that on June 25, 2011, officers Vagnini, Knight, Cline, Martinez and Kuspa approached him as he got out of his car after arriving at his grandmother's house on North 23rd Street in Milwaukee. Id. at

---

[1] Because the plaintiff's complaint is verified, the court treats it as "the equivalent of an affidavit" for purposes of this decision. See Devbrow v. Gallegos, 735 F.3d 584, 587 (7th Cir. 2013); Ford v. Wilson, 90 F.3d 245, 246–47 (7th Cir. 1996).

[2] For purposes of the official capacity claim against the Chief of the MPD, the court substitutes current Acting Chief of Police Jeffrey B. Norman for former Chief Flynn. See Fed. R. Civ. P. 25(d).

3

¶10. As the plaintiff was going up the stairs, Vagnini yelled his name and said, "If you go in that house we'll kick the door in and say you ran in there." Id. at ¶11. The five officers then "swarmed" the plaintiff; Vagnini grabbed his arm and directed him to the back of the car, slammed him against the car and handcuffed him. Id. at ¶12. Vagnini conducted a pat-down search of the plaintiff and at one point ran his bare hand down the back of the plaintiff's waistband and between his buttocks, then squeezed the plaintiff's genitals. Id. at ¶¶12–13. Shocked, the plaintiff asked, "What the hell are you doing?"; Vagnini shoved the plaintiff harder against the car and yelled at him not to resist. Id. at ¶13. Knight grabbed the plaintiff's right arm while Vagnini continued the search, during which the officers found no contraband or weapons. Id. at ¶14. The plaintiff was taken to jail but released five days later when no charges were filed. Id. at ¶15. The plaintiff alleges that Officers Busshardt and Vagnini falsified information about this search and arrest with the intent of falsely accusing the plaintiff of a crime in order to arrest and illegally search him. Id. at ¶39.

2. *The June/July 2011 incident*

Sometime in June or July 2011, the plaintiff was driving on North 23rd street with his cousin. Id. at ¶17. The plaintiff stopped at a four-way intersection, where he observed three MPD squad cars stopped together facing west at the stop sign on West Keefe Avenue. Id. While the plaintiff waited for the first car to proceed through the intersection, all three cars "aggressively" boxed in the plaintiff's car, nearly hitting it and making the plaintiff fear for his

4

safety. Id. at ¶18. Vagnini got out of one of the cars and ordered the plaintiff to turn off his car and get out, which the plaintiff did; he was directed to the back of the car. Id. at ¶¶19–20. Vagnini began a pat search of the plaintiff while other officers searched the plaintiff's car. Id. at ¶21. Vagnini again put his bare hand down the plaintiff's pants and between the plaintiff's buttocks. Id. at ¶21. The plaintiff says he told Vagnini "to be 'gone with that sh--,' indicating to Vagnini to stop the inappropriate touching." Id. at ¶22. Vagnini told him to shut up unless he wanted "to go to jail." Id. The officers found no contraband on the plaintiff or in his car and told him and his cousin that they were free to leave. Id. at ¶23.

        3.    *The July 4, 2011 incident*

On July 4, 2011, the plaintiff was at his grandmother's house on North 23rd Street celebrating the Fourth of July. Id. at ¶25. Just before 7:00 p.m., he was walking down 23rd Street when he was approached by several MPD officers, including Officers Valuch and Garland; Valuch told him to stop, and the plaintiff did. Id. Valuch conducted a pat search of the plaintiff, partially pulling the plaintiff's shorts down and sliding his hand back and forth between the plaintiff's buttocks. Id. at ¶26. The plaintiff told Valuch to stop, but Valuch told him "to shut up and quit 'resisting.'" Id. at ¶27. Valuch ordered the plaintiff to open his mouth (the plaintiff complied), then yelled to the other officers that the plaintiff had swallowed a baggie of narcotics. Id. at ¶28. The plaintiff says that he had not swallowed anything, didn't have anything in his mouth and did not have any contraband; he says he told "Valuch and his

5

cronies several times" that he hadn't swallowed anything. Id. at ¶28. Valuch and Garland arrested the plaintiff and took him to St. Mary's hospital, where they handcuffed him to one of the beds in the ER. Id. at ¶29.

Valuch and Garland told "medical personnel" that the plaintiff had swallowed a bag of narcotics; the plaintiff "vehemently denied and disputed" this. Id. at ¶30. Based on what Valuch and Garland had told them, the medical personnel told the plaintiff that he needed to drink "up to 2 gallons of a powerful laxative solution typically administered to pre-operation gastrointestinal patients that clears out the entire GI tract." Id. The plaintiff says that Valuch, Garland and the medical personnel told the plaintiff that he had to drink the solution until he eliminated the baggy of narcotics by defecating. Id.

The plaintiff says that he reiterated that he hadn't swallowed any drugs and that he didn't want to drink the solution. Id. at ¶31. He says, however, that Valuch, Garland and the medical personnel told him that if he refused, they would "restrain him and force a tube through his nostril and down into his stomach in order to pour the solution int Plaintiff's stomach." Id. In an attempt to avoid this, the plaintiff asked whether, if he drank some of the solution and defecated once without them finding any drugs in his stool, he could go home; he says that Valuch, Garland and the medical personnel agreed to this proposal. Id. at ¶32. The plaintiff says that he drank about four large cups of the solution, which caused him severe stomach and intestinal pain; over about two to three hours, he defecated several times. Id. at ¶33. The plaintiff says

6

that at that point, he stated that he wouldn't drink the solution anymore because no drugs had been found. Id. He reiterated that he hadn't swallowed anything and that he was refusing further medical treatment. Id.

The plaintiff says that Valuch and Garland responded by telling medical personnel that they wanted to force the plaintiff to drink the solution, and that the medical personnel agreed. Id. at ¶34. He says that Valuch and Garland "forcefully restrained" him, causing him pain, and that the medical personnel inserted a tube into his nose and down into his stomach, causing him more pain. Id. at ¶35. The solution was poured into the tube and into the plaintiff's stomach every hour for several hours. Id. The plaintiff says that he had painful, liquid bowel movements about every fifteen minutes, resulting in his anal area becoming raw and painful, but that no drugs or other items were found in his stool. Id. at ¶36. The plaintiff says that "in the morning"—implying that he was in the hospital all night on July 4 and into the morning of July 5—a different MPD officer relieved Valuch and Garland. Id. at ¶37. When this new officer learned what had happened, she told the medical personnel "that any further forced treatment was inappropriate and Plaintiff could be discharged from the hospital." Id. The plaintiff was transported from the hospital to the jail, and was released from the jail a few days later, with no charges were filed. Id.

C.    The Claims

After recounting the facts the plaintiff alleged in the complaint, Judge Clevert held that "Plaintiff's claims certainly implicate his Fourth Amendment rights, and he has alleged personal involvement by defendants Vagnini, Knight,

7

[C]line, Martinez, Kuspa, Busshardt, Valuch, and Garland. He may proceed on Fourth Amendment claims against these defendants." Dkt. No. 13 at 6. Judge Clevert continued:

> Plaintiff also submits that these illegal searches and seizures occurred as a result of long-standing Milwaukee Police Department policy. He also asserts that defendant Flynn "had received numerous complaints about police misconduct and illegal searches, seizure and sexual assaults being committed by his officers, but he deliberately failed to investigate them, thereby leading to more violations." (Doc. 1 at 6). Plaintiff may proceed on a claim against Flynn in his individual capacity regarding his own actions or inaction. He also may proceed on a claim against Flynn in his official capacity that the City of Milwaukee had a long-standing policy or custom of allowing (or encouraging) illegal searches and seizures. *See Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005).

Id.

### D. Facts Alleged at Summary Judgment

The defendants do not contest the plaintiff's description of the searches conducted by Officers Vagnini, Knight, Valuch and Garland and concede there are genuine issues of material fact precluding summary judgment on the claims against those defendants. Dkt. No. 120 at 2. They seek partial summary judgment on the individual and official capacity claims against Chief Flynn, the conspiracy claims against all defendants and the claim against Officer Busshardt. Id. at 6–14.

#### 1. *Chief Flynn*

From 2008 through 2012, Officers Vagnini, Kuspa, Knight, Cline, Martinez and others, supervised by Sergeant Jason Mucha, patrolled District 5 in Milwaukee as part of the Power Shift Unit, which runs from 7:00 p.m. until 3:00 a.m. Dkt. No. 129 at ¶¶22–24; Dkt. No. 127-3 at 7:12–14. The plaintiff

8

describes the Power Shift Unit as an "anti-gang" unit whose purpose was proactive policing; he says that Vagnini and other officers "associated with the Unit" would meet with Flynn and come away with understandings about the expectations of the unit. Dkt. No. 129 at ¶¶26, 28–31. The plaintiff asserts that Vagnini's "understanding" of what was communicated at those meetings "was that the Chief of Police and command staff wanted dots on a map to show that police work was being done; they wanted traffic stops and field interview stops in the area so they could say that something was being done by the police." Id. at ¶29. The plaintiff asserts that "[f]ollowing 2008, after Chief Flynn became chief," when a serious crime happened in a certain neighborhood, "the policing technique that was directed was to saturate that area, make traffic stops and conduct field interviews." Id. at ¶30. The plaintiff says that the more stops and interviews the officers in District 5 conducted, the likelihood that they would conduct a pat down or other search would increase. Id. at ¶31. The defendants assert that the evidence does not support the plaintiff's allegations. Dkt. No. 133 at ¶¶28–31.

The MPD has established policies and procedures for various issues, including how to properly search people. Dkt. No. 121 at ¶7. Flynn states that as Chief of Police he was responsible for the overall conduct of the MPD, but that he was not involved in and had no knowledge of all complaints against, disciplinary issues with or day-to-day activities of every officer or supervisor. Id. at ¶8; Dkt. No. 122-3 at ¶15. Flynn says that before March 2012, he wasn't aware of any incidents that would have suggested to him that MPD officers

didn't understand department policies or Wisconsin law regarding searches of individuals, or that more training was needed. Dkt. No. 121 at ¶¶9–10; Dkt. No. 122-3 at ¶¶16–17. He asserts that before March 2012, no supervisor or officer informed him that people were being improperly searched. Dkt. No. 121 at ¶12; Dkt. No. 122-3 at ¶19. Flynn also states that before December 21, 2011—and while he was chief—he never "witnessed any inappropriate or illegal strip search, cavity search or pat down" and had never "seen a City of Milwaukee Police Officer search someone by sticking their hand in a suspect's underwear as part of a pat down search." Dkt. No. 121 at ¶11; Dkt. no. 122-3 at ¶18. He says that before December 21, 2011, he was never informed of any incident "which would have led him to believe that Officers needed additional training as to how to conduct a proper search, that officers were not being properly supervised or that officers were not being disciplined when such discipline was warranted." Dkt. No. 121 at ¶12; Dkt. No. 122-3 at ¶19.

The defendants state that before 2012, only two complaints had been filed against Vagnini regarding search and seizure. Dkt. No. 121 at ¶13. Internal affairs records reflected a 2010 allegation by "L.R." against Vagnini; the records indicated that the allegation was investigated and that the lieutenant in charge of Internal Affairs deemed the allegations "unsubstantiated." Id. at ¶14. The records revealed that "M.T." filed a similar complaint against Vagnini in 2011; after investigation, that allegation was referred to the Milwaukee County District Attorney's Office, which declined to bring criminal charges against Vagnini. Id. at ¶15.

10

The defendants filed an affidavit by Captain David A. Salazar, Jr., who was a lieutenant in the Internal Affairs Division of the Milwaukee Police Department in early 2012. Dkt. No. 122-4. Salazar averred that around January 31, 2012, two citizen complaints were brought to "our" (presumably the IAD's) attention by representatives of the Milwaukee Fire and Police Commission. Id. at ¶4. The complainants were identified as "R.M." and "B.C." Id. Apparently these two individuals had appeared together at the Fire and Police Commission on January 31, 2012; each filed a separate complaint against Vagnini alleging that he had "engaged in unlawful search practices" during a traffic stop. Id. The receipt of these complaints prompted members of the Internal Affairs Division to review Vagnini's "internal affairs records of a criminal nature." Id. at ¶5. That review uncovered the 2010 complaint by L.R. and the fact that it had been deemed "unsubstantiated," Id. at ¶6, as well as the 2011 complaint by M.T. that had been referred to the DA's office, id. at ¶7.

Reviewing all four complaints, Salazar concluded that they might show a pattern "of inappropriate and/or unlawful behavior on the part of Officer Vagnini." Id. at ¶9. Salazar reopened the L.R. and M.T. files and directed his staff to investigate further, as well as directing that investigation files be opened on the R.M. and B.C. complaints. Id. Salazar avers that by February 13, 2012, he had contacted the DA's office to obtain guidance on how to proceed with the investigations; by that time, he believed that the investigations were "of a criminal nature." Id. at ¶10. Salazar attests that he kept both his captain, Diane Rowe, and the assistant chief of police, John

11

Hagen, apprised of the complaints and of IAD's investigations regarding the complaints. Id. at ¶11. He avers that Flynn was "fully briefed regarding the four complaints, and our investigation regarding them, on March 20, 2012." Id. at ¶12. Salazar says that immediately after Flynn was briefed, Vagnini and the other officers assigned to his shift and unit "were suspended;" he says that their "powers were suspended, and they were reassigned to various work locations throughout the Milwaukee Police Department, pending the completion of our investigation." Id. at ¶13.

Salazar attached to his affidavit the June 2011 Milwaukee Police Department operating procedures regarding strip searches and excerpts from the Wisconsin Law Enforcement Officers Criminal Law Handbook in effect at that time. Id. at pp. 6-21. The MPD procedures prohibited strip searches without probable cause to believe that the person to be searched had secreted a weapon or evidence and in the absence of the approval of a captain or higher. Id. at 7. They prohibited conducting a strip search in the view of anyone not conducting the search. Id. at 8. The procedures prohibited police personnel from conducting cavity searches. Id. at 9. The state law enforcement handbook cautioned that before any officer conduced a strip search, the officer should be aware of the requirements of Wis. Stat. §968.255 and be familiar with department policies; it also cautioned that failure to conform to those requirements could result in liability lawsuits, a $1,000 fine and/or imprisonment for not more than ninety days. Id. at 16. It, too, prohibited officers from conducting body cavity searches. Id.

The plaintiff denies Flynn's assertions that prior to March 2012, Flynn wasn't aware of improper searches or of incidents suggesting that officers did not understand the law and policies governing searches; the plaintiff cited the depositions of Vagnini, Knight and other MPD officers in this and other cases. Dkt. No. 130 at ¶¶9–10. The plaintiff also cited decisions in other cases filed against Flynn, Vagnini or other MPD officers in the Eastern District of Wisconsin, involving allegations like the plaintiff's. Dkt. No. 129 at ¶¶40–41 (citing Bohannon v. City of Milwaukee, 998 F. Supp. 2d 736, 748 (E.D. Wis. 2014), and Newman v. Vagnini, No. 15-CV-1363-JPS, 2016 WL 6090859, at *3 (E.D. Wis. Oct. 18, 2016)).

The plaintiff does not dispute that before December 2011, and while Flynn was Chief of Police, Flynn never personally witnessed any inappropriate or illegal strip search, cavity search or pat-down and never saw any MPD officer search a suspect by sticking his hand in the suspect's underwear. Dkt. No. 121 at ¶11; Dkt. No. 122-3 at ¶18. Nor does the plaintiff dispute that at his deposition, the plaintiff did not testify that Chief Flynn was personally involved in any search or arrest of the plaintiff. Dkt. No. 121 at ¶5.

2.    *Conspiracy Claims*

At his deposition the plaintiff testified that during the June 25, 2011 stop, Martinez and Cline stood behind Vagnini when Vagnini approached the plaintiff and told him to stop before entering his grandmother's house. Dkt. No. 122-1 at 113:2–6. He testified that he did not recall any other officer saying anything. Id. at 113:7–12.

13

The plaintiff also testified that the police stopped him forty to fifty times between 2006 and June 2011. Dkt. No. 122-1 at 74:8–11. He said that Vagnini was involved in several of those stops, and the plaintiff testified that Vagnini seemed to single out the plaintiff and several of his friends. Id. at 89:4–10. The plaintiff testified that every time he would see Vagnini, "it doesn't matter who I'm with or what car I'm in, he's going to stop me." Id. at 88:24–89:3. He did not testify that other officers singled him out or stopped him as frequently as Vagnini. The plaintiff testified that the only improper searches he experienced between 2010 and 2011 were the ones described in his complaint, and that no other officer than Vagnini, Valuch and Garland improperly searched him. Dkt. No. 122-2 at 224:5–15.

The defendants assert that the plaintiff did not testify at his deposition about any agreement or "meeting of the minds" between Vagnini and any other defendant. Dkt. No. 121 at ¶6. The plaintiff denies this statement of fact; he cites to his own proposed findings of fact that on June 25, 2011, Vagnini, Knight, Martinez, Kline and Kuspa "swarmed" him and that Knight observed Vagnini's "assault" of the plaintiff on that date but did not intervene despite having the opportunity to do so. Dkt. No. 130 at ¶6 (citing Dkt. No. 129 at ¶¶5, 9).

### 3. *Officer Busshardt*

The plaintiff does not dispute that Officer Busshardt was not personally involved in or present during any of the arrests or searches of the plaintiff. Dkt. No. 121 at ¶¶1, 3. The defendants cite to the plaintiff's deposition in pointing

14

out that the plaintiff testified only that Busshardt was the author of some police reports. Id. at ¶2. The plaintiff does not dispute that he has never seen or met Busshardt. Id. at ¶4.

        4.    *Deposition Testimony from Vagnini, Mucha and Knight*

The plaintiff cited excerpts from deposition testimony in support of his denial of Flynn's claim that Flynn was not aware of unlawful searches prior to March 2012.

The plaintiff deposed Vagnini on July 30, 2019. Dkt. No. 127-10. Vagnini testified that around Valentine's Day of 2008, there was a televised press conference "at the district" with Flynn. Id. at 11, Tr. p. 37 at lines 16-25; 12, Tr. p. 38 at lines 1-25. Vagnini said that Flynn "assigned us to that area around 19th and Nash," and that "[w]e were supposed to be proactive." Id. at 12, Tr. p. 38, lines 7-9, 16-17. Vagnini said, "he [Flynn] wanted us out there being proactive." Id. at 12, Tr. p. 38, line 24. The following exchange occurred:

> ATTORNEY CADE:      Okay. And this proactive policing, were you told what you were supposed to do in terms of being proactive?
>
> VAGNINI:   Just supposed to be making stops, being visible, conducting business checks, just be out there and be seen.
>
> Q:     Well, when you say "making stops," was that part of the directive—I mean, was that solely as part of the press conference that they are going to be making traffic stops, or was that later on relayed to you that the intent is for you to make traffic stops?
>
> A:     I don't remember if it was in that press conference that he said that we were specifically going to make traffic stops, but, I mean, it was every single day in role call. It wasn't just for the proactive cars. It was for the cars that were taking assignments that District 5 had "X" number of traffic stops, and the expectation was "Y," and I don't remember exactly on the day what that number was, but I can

15

remember, like, lieutenant saying, "We don't have enough traffic stops today."

Q:   What was the end all, be all of a traffic stop?

A:   Because Edward Flynn was under the belief that you could stop stolen cars if people who stole them saw cars stopped, that they would stop stealing them.

Q:   Was the sole intent to stop stolen cars, or was it to look for drugs?

A:   I don't know exactly what his intent was. I know one of the times he said that stolen cars were through the roof, and if more cars got stopped, less cars would get stolen. That was his philosophy.

Id. at 12, Tr. p. 39 at lines 24-25; 13, Tr. p. 40 at lines 1-25, Tr. p. 41 at lines 1-8. Vagnini testified that during the summer, overtime would go up, and that Mucha told him that during the overtime, "you have to be proactive. You have to stop cars. You have to log traffic stops. You have to be proactive." Id. at 6, Tr. p. 17, lines 1-22.

Jason Mucha was deposed in a different case on June 17, 2014. Dkt. No. 127-7. The plaintiff points out that in response to a question about whether Mucha's police training included training on when, if ever, he could conduct a strip search, Mucha responded that he didn't think it ever was brought up at the academy. Id. at 42, Tr. p. 101 at lines 12-16. Jacob Knight also was deposed in that prior case; his deposition took place on June 19, 2014. Dkt. No. 127-11. Knight testified that he was taught that if there were narcotics in someone's pants, he could "go in and get the, get the narcotics." Id. at 4, Tr. p. 25 at lines 13-21. He testified that he'd never had skin-to-skin contact with anyone, but he had been told that he could "use layers of skin as a shield to

16

manipulate items." Id. at 6, Tr. p. 27 at lines 7-12. Knight testified, "You're not, you know, touching anyone's genitals. You're not—at least the way that I performed the searches to retrieve narcotics, you weren't physically touching anyone." Id. at 6, Tr. p. 27 at lines 21-25.

     5.    *Other Cases*

In his brief in opposition to the defendant's motion, the plaintiff cites decisions from other cases filed in this district against the MPD or its officers, arguing these cases prove that prior to the events the plaintiff describes, the City and Flynn had reason to know about Milwaukee Police Officers— particularly Vagnini—were conducting unlawful searches.

He cites Bohannon v. City of Milwaukee, 998 F. Supp. 2d 736, 739 (E.D. Wis. 2014), in which plaintiff Joe Bohannon filed suit on October 31, 2013 against the City of Milwaukee, Chief Flynn and several MPD officers, including Vagnini. Dkt. No. 126 at 5. Bohannon alleged that on April 21, 2008, Vagnini searched him without probable cause, pulling out Bohannon's pants and underwear, reaching into his pants and shoving his finger in Bohannon's anus—all in public. Id. Bohannon alleged that when he tried to elbow Vagnini and run, Vagnini and others beat him. Id. at 739-740. Bohannon alleged that "as early as 2008, MPD's Internal Affairs Division and supervisors, including defendants Flynn and Mucha, received" complaints about similar illegal strip and cavity searches, "but consistently rejected them as meritless." Id. at 740.

The defendants filed a motion for partial judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Id. District Judge J.P. Stadtmueller

noted that at the pleadings stage, he was required to take all of Bohannon's factual allegations, stated in the complaint, as true and to draw all reasonable inferences in Bohannon's favor. Id. at 739 n.1. Judge Stadtmueller found that the plaintiff had alleged that the city received numerous complaints of illegal searches prior to the April 2008 incident of which Bohannon complained but had done nothing; taking those allegations true (as he was required to do at the pleadings stage), Judge Stadtmueller found that the plaintiff had stated sufficient facts to state a Monell[3] claim against the city. Id. at 743-47. Bohannon also alleged in the complaint that Flynn and Mucha knew or should have known about the pattern of improper searches and "facilitated, approved, condoned, turned a blind eye to, and/or purposefully ignored" it. Id. at 748. Describing those allegations as "limited and conclusory," Judge Stadtmueller nonetheless found that viewed in conjunction with the other facts Bohannon had alleged, they were sufficient to state a supervisory liability claim against Flynn and Mucha. Id.

The plaintiff also cites Newman v. Vagnini, No. 15-CV-1363-JPS, 2016 WL 6090859 (E.D. Wis. Oct. 18, 2016). Dkt. No. 126 at 4. Willie James Newman filed this suit on November 13, 2015. Newman v. Vagnini, et al., Case No. 15-cv-1363-JPS at Dkt. No. 1. Among others, Newman sued Vagnini, Cline, Martinez, Knight, Flynn and the City of Milwaukee. Id. At the summary judgment stage, the "largely undisputed facts" showed that in the early morning of April 30, 2010, Vagnini and other officers ordered Newman out of

---

[3] Monell v. Dep't of Soc. Serv., 436 U.S. 658 (1978).

his car (which was parked in a restaurant parking lot), that an officer searched him and that after the search, Vagnini pulled down Newman's pants and underwear and "searched" Newman's genital area with his hands. <u>Newman v. Vagnini</u>, 2016 WL 6090859, at *1. Judge Stadtmueller made the following findings of fact in ruling on the summary judgment motion:

### 3.2 District Five Policing

The Milwaukee Police Department's ("MPD") District Five covers an area of the city which is ninety percent African American. RPSOF[4] ¶ 8. Beginning in 2010, an anti-gang unit comprised entirely of white police officers, including the Officer Defendants, was created to do "proactive policing" in District Five. RPSOF ¶¶ 9-10, 12-13. This unit was led by Sergeant Jason Mucha ("Mucha"). RPSOF ¶ 11. On a typical day, "proactive policing" involved use of the "train" strategy. RPSOF ¶¶ 14-16. In the train strategy, the lead car, usually Vagnini, would be responsible for selecting vehicles to stop or persons to be interviewed. RPSOF ¶ 18. The train strategy led to more traffic stops and individual interviews, which in turn increased the likelihood of searches being conducted. RPSOF ¶ 23. The train strategy was discontinued in District Five on March 20, 2012, because the anti-gang unit officers were suspended by the MPD. RPSOF ¶ 17. By March 21, 2012, the media began widespread reporting of the strip search scandal. RPSOF ¶ 30-31.

### 3.3   Chief Flynn's Involvement

Milwaukee Police Chief Edward A. Flynn ("Flynn") took that position in 2008. Once the anti-gang unit began operating, Flynn attended meetings with Vagnini and other officers. Those officers would report on the meetings to the other members of the anti-gang unit. RPSOF ¶ 19. This included Jacob Knight ("Knight"), with whom they discussed the directives issued in those meetings. RPSOF ¶ 20. They told Knight that Flynn and the other command staff "wanted dots on a map," meaning traffic stops and individual interviews, "so they could say that something was being done by the police." RPSOF ¶ 21. This coincided with the strategy employed after Flynn became chief in 2008, which was that after a serious crime occurred in an area, the police would "saturate" that area, conducting additional

---

[4] "Response to Newman's Statement of Facts." <u>Newman v. Vagnini</u>, 2016 WL 6090859, at *1.

traffic stops and interviews. RPSOF ¶ 22. The defendants claim that this strategy may not have preceded Flynn taking office. RPSOF ¶ 22.

Flynn did not, however, know that the train strategy was being employed by the anti-gang unit until 2012. RPSOF ¶ 24. If he had, Flynn would have stopped its use because it is not an effective use of limited police resources. RPSOF ¶ 25. Newman concedes that Flynn was not actually aware of the strip search issue prior to March 2012, but maintains that he should have been aware. RSOF[5] ¶¶ 32-33.

In March 2012, after the strip search scandal broke, Flynn told the media that the issue of strip and body cavity searches was a "serious training issue." RPSOF ¶ 29. He further commented that the strip search scandal was "an egregious violation of public trust," that the officers involved "went rogue," and that they "broke the law" and violated MPD policy. RPSOF ¶ 46. Nevertheless, Flynn had approved multiple promotions for the supervisors of District Five. RPSOF ¶ 46.

### 3.4   MPD Investigation

In early 2012, Captain David Salazar ("Salazar") was assigned to the MPD Internal Affairs division, where he investigated citizen complaints against police officers. RSOF ¶¶ 7-8. On January 31, 2012, Salazar received two complaints directed at Vagnini for unlawful search practices during a traffic stop. RSOF ¶¶ 9-11. Salazar reviewed Vagnini's records which revealed similar allegations from March 5, 2010, and sometime in 2011. RSOF ¶¶ 12-13, 15. The March 5, 2010 complaint was investigated, found unsubstantiated, and closed. RSOF ¶ 14. The 2011 complaint was investigated and turned over to the Milwaukee County District Attorney for prosecutorial review, but no charges resulted, and that complaint was not otherwise pursued. RSOF ¶¶ 16-19.

Upon review of these complaints, Salazar determined that they might show a pattern of unlawful behavior by Vagnini. RSOF ¶ 20. He ordered that the old complaints be opened and reinvestigated as well as an investigation of the new complaints. RSOF ¶¶ 21-22. Salazar kept his superiors informed of the status of his investigation and also contacted the Milwaukee County District Attorney for advice on the possibility of criminal charges against Vagnini. RSOF ¶¶ 25-26.

---

[5] "Response to the defendants' Statement of Facts." <u>Newman v. Vagnini</u>, 2016 WL 6090859, at *1.

> Flynn was first fully briefed regarding the Vagnini investigation on March 19 or 20, 2012. RSOF ¶ 27. By that date, Newman had not filed any complaints against the Officer Defendants. RSOF ¶¶ 23-24. Immediately after the briefing, Flynn suspended Vagnini and the rest of the anti-gang unit. RSOF ¶ 28. In 2013, Flynn instituted MPD-wide retraining on policies related to searches. RPSOF ¶ 41.

Id. at *1-3.

Newman alleged that the City of Milwaukee failed to train or supervise the anti-gang unit that conducted the unlawful searches. Id. at *6. Judge Stadtmueller concluded that Newman had not shown that Flynn knew that the officers' training presented an obvious potential for constitutional violation. Id. He also concluded that there was "no evidence that Flynn knew of any strip search issues until 2012, and once Salazar completed his investigation and briefed him, Flynn suspended the anti-gang unit and instituted MPD-wide retraining on searches." Id. Based on that record, Judge Stadtmueller found that "the City cannot bear *Monell* liability for a strip search problem that was not obvious and that it did not know about until well after Neman's complained-of search." Id.

Finally, the plaintiff cites Collins v. Milwaukee, No. 17-CV-234, 2017 WL 10505094 (E.D. Wis. 2017). Dkt. No. 126 at 5. On February 22, 2017, Charles Collins and others filed a civil rights action challenging the City of Milwaukee's stop-and-frisk program. Id. at 1. They asserted that the program authorized MPD officers to stop and frisk people without reasonable suspicion and that it targeted Black and Latinex individuals. Id.

21

**II.     Discussion**

      A.     <u>Summary Judgment Standard</u>

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." <u>Anderson</u>, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>Id.</u> "[D]isputed facts that are not outcome-determinative are not material and will not preclude summary judgment." <u>Montgomery v. Am. Airlines, Inc.</u>, 626 F.3d 382, 389 (7th Cir. 2010).

To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. <u>Brummett v. Sinclair Broad. Grp., Inc.</u>, 414 F.3d 686, 692 (7th Cir. 2005). A party may provide this evidence through affidavits or declarations but only if the affidavits "(1) attest[] to facts of which the affiant has 'personal knowledge'; (2) 'set[] out facts that would be admissible in evidence'; and (3) 'show[] that the affiant or declarant is competent to testify on the matters stated.'" <u>James v. Hale</u>, No. 19-1857, 2020 WL 2487603, at *5 (7th Cir. May 14, 2020) (quoting Fed. R. Civ. P. 56(c)(4)). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party

will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

    B.    <u>Chief Flynn</u>

The plaintiff does not dispute that Chief Flynn was not personally involved in any of the contested searches of the plaintiff; he asserts that Flynn should be held responsible as the Chief of Police in both his official and individual capacities.

    1.    *Official Capacity*

As Judge Clevert noted in the screening order, the court must construe the plaintiff's official capacity claim as a claim alleged against the City of Milwaukee. Dkt. No. 13 (citing <u>Grieveson v. Anderson</u>, 538 F.3d 763, 771 (7th Cir. 2008)). When a plaintiff asserts a §1983 claim against a municipality or county, the court must analyze two issues: (1) whether the plaintiff's harm was caused by a constitutional violation; and (2) if so, whether the municipality or county is responsible for that violation. <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115, 120 (1992).

A local government "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under §1983 on a *respondeat superior* theory." <u>Monell</u>, 436 U.S. at 691 (emphasis in original). A municipality may "be held liable under § 1983 only for its own violations of federal law." <u>Los Angeles Cty., Cal. v. Humphries</u>, 562 U.S. 29, 36 (2010) (citing <u>Monell</u>, 436 U.S. at 694). To demonstrate municipal liability, a plaintiff "must demonstrate that there was an 'official policy, widespread

custom, or action by an official with policy-making authority [that] was the "moving force" behind his constitutional injury.'" Estate of Perry v. Wenzel, 872 F.3d 439, 461 (7th Cir. 2017) (quoting Daniel v. Cook Cty., 833 F.3d 728, 734 (7th Cir. 2016)). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" City of St. Louis v. Praprotnik, 485 U.S. 112, 138 (1988) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479–80 (1986) (emphasis in original)).

The "official policy or custom" may take different forms. It may be "(1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" Milestone v. City of Monroe, Wis., 665 F.3d 774, 780 (7th Cir. 2011) (quoting Darchak v. City of Chi. Bd. of Educ., 580 F.3d 622, 629 (7th Cir. 2009)). To prove the second form—a "widespread, though unwritten, custom or practice"—the plaintiff must demonstrate a custom or practice "that although not authorized by written law and express policy, is so permanent and well-settled as to constitute a 'custom or usage' with the force of law." Calhoun v. Ramsey, 408 F.3d 375, 379 (7th Cir. 2005) (quoting McTigue v. City of Chi., 60 F.3d 381, 382 (7th Cir. 1995)). If the "custom or practice" resulted from inadequate training or supervision, the plaintiff must prove "deliberate indifference" on the part of the municipality, either by showing "(1) failure to provide adequate training in light of foreseeable consequences; or (2) failure to

act in response to repeated complaints of constitutional violations by its officers." Sornberger v. City of Knoxville, Ill., 434 F.3d 1006, 1029-1030 (7th Cir. 2006) (citing City of Canton v. Harris, 489 U.S. 378, 390 & n.10 (1989); Robles v. City of Ft. Wayne, 113 F.3d 732, 735 (7th Cir. 1997)). A municipality would be "deliberately indifferent if it failed to provide further training after learning of a pattern of constitutional violations involving the exercise of police discretion." Robles, 113 F.3d at 735 (citing City of Canton, 489 U.S. at 390 n.10).

Reminding the court that it must consider the facts at summary judgment in the light most favorable to him, the plaintiff asserts that "[t]here is ample evidence that a substantial number of illegal strip search complaints were levied against officers in Milwaukee Police District 5 before the searches of JerPaul Spencer." Dkt. No. 126 at 14-15. He asserts that

> Starting in 2008, Chief Flynn instituted a policy of proactive policing in District 5 that would, of necessity, result in police pat downs and searches of individuals in that district without probable cause to do such pat downs. . . . This policy created a recurring situation that presented an obvious potential for constitutional violations if these subordinate police officers did not receive training in how to recover suspected narcotics detected as part of the search and without a policy of supervision in place to determine if these searches were done in a permissible manner. . . .
>
> The evidence adduced to date creates a question of fact as to whether Chief Flynn's policy was done without training these subordinate filed officers in how to properly perform strip searches, and without providing supervision to ensure that the recurring pat downs and searches were performed in a constitutionally permissible manner. The end result of this conduct is the numerous complaints by African American males alleging that they were the victims of unconstitutional strip searches by District 5 officers.

Id. at 16-17.

The evidence in the record does not support these broad assertions. Vagnini's deposition testimony in this case does not support these assertions. Vagnini testified at his deposition that he interpreted a televised press conference by Flynn as a directive that officers must be "proactive"—make stops, be visible. He testified that statistics on traffic stops, and quota-like goals for the number of such stops, were discussed every day at roll call. He testified that Mucha, the supervisor of the Power Shift Unit, told him that if he signed up for overtime, he needed to be "proactive," making stops. None of this evidence proves that Flynn instituted the policy of conducting lots of stops and searches. At best, it shows that Vagnini perceived, from remarks Flynn had made at a press conference and the daily roll call emphasis on statistics in his district, that Vagnini and other officers was expected to conduct lots of stops and searches.

The plaintiff also attached to his counsel's declaration a transcript of Vagnini's May 13-14, 2014 deposition in Venable v. City of Milwaukee, Case No. 13-C-1114 (E.D. Wis.). Dkt. No. 127-5. The transcript is seventy-nine pages long. The plaintiff does not cite it in his opposition brief or in his proposed findings of fact. He does not explain what portions are relevant to his arguments or what conclusions he believes the court should draw from the deposition.

Nor do the prior cases the plaintiff cites support these assertions. The incidents the plaintiff described in the complaint occurred between May and July 2011. Relying on Judge Stadtmueller's decision in Bohannon, the plaintiff

26

asserts that there already has been a judicial finding that the City of Milwaukee "necessarily had knowledge or notice that aggressive searches were occurred and were deliberately indifferent" before May 2011. Dkt. No. 126 at 5. Although the plaintiff refers repeatedly to the Bohannon decision in his opposition brief, he either misunderstands or mischaracterizes the decision in each reference. The plaintiff asserts that "in denying the City of Milwaukee and the defendants' motion for *summary judgment*," Judge Stadtmueller held in Bohannon "that the plaintiff had sufficiently alleged that the city received numerous complaints of illegal searches prior to the incident in question." Dkt. No. 126 at 5 (citing Bohannon, 998 F. Supp.2d at 745) (emphasis added). The plaintiff misstates the procedural posture of Bohannon. The defendants in Bohannon had *not* moved for summary judgment; Judge Stadtmueller issued his decision at the *pleadings* stage, denying the defendants' Rule 12(c) motion for judgment on the pleadings. Bohannon, 998 F. Supp. 2d at 739. This distinction is critical, and fatal to the plaintiff's reliance on the case to support his position.

Judge Stadtmueller explained at the beginning of the decision that under the Rule 12(c) standard, he was required to treat the plaintiff's factual allegations in the complaint as true, draw all reasonable inferences in Bohannon's favor and determine whether the complaint stated a claim that was plausible on its face. Id. at 741 (citations omitted). Judge Stadtmueller specifically noted that Bohannon did not need to "plead extremely specific facts;" he just needed to give the defendants notice of the claims he was

27

asserting. Id. Even under that lower standard—a standard that did not require the plaintiff to support his claims with evidence, as he would have had to if the defendants sought summary judgment—Judge Stadtmueller stated that it was a "much closer question as to whether the complaint meets the pleading standard on the second element of a *Monell* claim" (the element of whether the City had a policy or custom that caused the violation of Bohannon's rights). Id. at 743. After carefully reviewing the case law regarding what a plaintiff must show to prove a policy or custom, Judge Stadtmueller concluded that "[t]he plaintiff's allegations, taken as true, adequately state a claim that is plausible on its face" that the city had a custom or practice that led to his alleged constitutional violation. Id. at 745. Most important to that conclusion, Judge Stadtmueller stated, was the fact that "the plaintiff has sufficiently alleged that the City received numerous complaints of illegal searches prior to the incident in question." Id. When the defendants responded that the plaintiff had not given details of these prior complaints—the sources, dates, places—Judge Stadtmueller reminded the defendants that at the pleading stage, "[g]eneral allegations that the City and MPD received complaints is enough to give rise to an inference that its officials had knowledge that other, similar illegal searches were occurring." Id. at 746. He cautioned that "[t]he evidence adduced during discovery may ultimately prove" that the City did not have a custom or practice of being deliberately indifferent to illegal searches, but said, "that is an inquiry for another day." Id. at 747.

28

So—Bohannon is not a judicial finding that the City of Milwaukee had received "numerous complaints of illegal searches prior to the incident in question," or that the City "necessarily had knowledge or notice that aggressive searches were occurring and was deliberately indifferent." Dkt. No. 126 at 5. Bohannon is a judicial finding that the plaintiff sufficiently had *alleged* those facts for the purposes of surviving a motion for judgment on the pleadings. Yet the plaintiff says,

> Judge J.P. Stadtmueller concluded in *Bohannon* that given the number of serious allegations against MPD officers in the same police district (including many of the same defendant officers) and the fact that the illegal pat downs were allowed to continue unabated for a substantial period of time, a jury could draw the reasonable inference that Chief Flynn was aware of the troubling conduct and did nothing to stop it, either because he wanted to turn a blind eye or he condoned it. *See Bohannon*, 998 F. Supp. 2d 736, 748 (E.D. Wis 2014).

Dkt. No. 126 at 6. This is a mischaracterization of what Judge Stadtmueller said, and what he held, in Bohannon.

The plaintiff similarly mischaracterizes Bohannon in support of his argument that "[t]here is little doubt that Flynn had knowledge of the misconduct being carried out by the officers under his command." Dkt. No. 126 at 9. There, he asserts that Judge Stadtmueller found in Bohannon that "as early as 2008, MPD's Internal Affairs Division and supervisors, including Flynn, received complaints." Id. Again, Judge Stadtmueller found in Bohannon that the plaintiff *alleged* these facts—there was no evidence before Judge Stadtmueller at that stage of the litigation. Finally, the plaintiff states that Judge Stadtmueller, "in denying prior motions for summary judgment brought

29

by the City of Milwaukee for this same issue . . . specifically noted that 'that the City received numerous complaints of illegal searches prior to the incident in question . . . the MPD had been receiving complaints for years before,'" citing to Bohannon. Dkt. No. 126 at 14-15. As the court has explained, Bohannon did not involve a motion for summary judgment.

The plaintiff also relies on Judge Stadtmueller's decision in Newman to support his assertion that prior to the May-July 2011 searches of the plaintiff, there was a "pattern and practice of illegal conduct perpetrated at Flynns' behest." Dkt. No. 126 at 9. Unlike Bohannon, Newman did involve a ruling on a motion for summary judgment, which meant that Judge Stadtmueller made his ruling based on evidence, and not on the allegations in the complaint. Newman, 2016 WL 6090859, at *1. The plaintiff emphasizes that in Newman, "Judge Stadtmueller found that during an investigation conducted by Captain Salazar, there had been allegations against Vagnini from March 5, 2010 and all throughout 2011." Dkt. No. 126 at 9. The court has included in this decision the portion of Judge Stadtmueller's order denying the defendants' motion for summary judgment; it recounts the same facts that Salazar recounted in his affidavit in this case: that prior to January 31, 2012, there had been only two unlawful search-related complaints against Vagnini (the complaint from March 5, 2010, which was found unsubstantiated, and the complaint from sometime in 2011, which was referred to the DA's office with no charges filed). Newman, 2016 WL 6090859, at *3.

30

The plaintiff emphasizes that Judge Stadtmueller found in <u>Newman</u> that in 2012, Vagnini and other officers on the Power Shift Unit were criminally prosecuted "for their illegal searches." Dkt. No. 126 at 9. While this statement is correct, it also is irrelevant to the question of whether the City knew, *prior to the May-July 2011 period*, that Vagnini and others were engaged in a pattern of illegal searches. The fact that the officers were prosecuted in 2012, or that in 2012 Flynn instituted new training procedures, does not, as the plaintiff alleges, show "that Flynn knew about the illegal searches being performed since at least 2010 when Vagnini's complaints were first investigated." Dkt. No. 126 at 10. In fact, the *evidence* on this issue is Salazar's sworn affidavit. Salazar explains (as he appears to have done in <u>Newman</u>) that first learned of the 2010 complaint from L.R. and the 2011 complaint from M.T. in early *2012*, after being advised by the Fire and Police Commission that two other individuals had made complaints against Vagnini on January 31, 2012. Salazar says that he did not brief Flynn until March 2012, at which point the Power Shift Unit officers immediately were suspended. Judge Stadtmueller found the same facts in <u>Newman</u>.

The plaintiff says that "Judge Stadtmueller already found [in <u>Newman</u>] that the MPD had a policy of saturating an area with police and conduct traffic stops and interviews and this policy was not used before Flynn." Dkt. No. 126 at 16. That is not exactly what Judge Stadtmueller found—he found that Flynn became chief in 2008, that Flynn attended meetings with Vagnini and other officers, that those officers reported to Knight that Flynn and the command

31

staff wanted "dots on a map"—traffic stops and individual interviews—and that "[t]his coincided with the strategy employed after Flynn became chief in 2008, which was that after a serious crime occurred in an area, the police would 'saturate' the area, conducting additional traffic stops and interviews." Newman, 2016 WL 6090859, at *2. Word parsing aside, Judge Stadtmueller had some evidence before him that is not before this court. And even assuming that the evidence in this court's record established that Flynn—the city policymaker—encouraged more stops and interviews, the plaintiff has not drawn a link between that encouragement and Vagnini's alleged sexual assaults of the plaintiff, or the forced stomach-pumping of the plaintiff.

The plaintiff says that "Judge Stadtmueller also found [in Newman] that Vagnini was not taught how to conduct a search and thought that it was lawful" to manipulate a person's butt and genitals." Dkt. No. 126 at 16 (citing Newman, 2016 WL 6090859, at *4). The facts before Judge Stadtmueller were the following:

> Vagnini testified that his training was also deficient. He stated that the technique he used to search Newman was not taught by the MPD. RPSOF ¶ 48. Vagnini claimed that he was trained on how to search people and conduct pat downs, but received no training on how to recover drugs hidden in various places on a person. RPSOF ¶ 48. Instead, he spoke with two Wisconsin district attorneys in 2007, who informed Vagnini that in a lawful search, he could "manipulate" a person's butt and genitals through their clothing "as long as you don't expose anything private" or have skin-to-skin contact with the person. RPSOF ¶ 48. Vagnini did not demonstrate this technique to his MPD supervisors, but Mucha observed Vagnini using it and did not object. ¶ 48.

Newman, 2016 WL 6090859, at *4.

32

In his deposition for this case, Vagnini did not testify about his training, or how he conducted pat-down searches; he was not asked. In this case, Vagnini testified that he had no recollection of ever searching or arresting the plaintiff, although he knew who the plaintiff was. Dkt. No. 127-10 at 14, Tr. p. 49 at lines 1-25. The plaintiff attached to his counsel's declaration the transcript of Vagnini's June 3, 2016 deposition in <u>Newman</u>. Dkt. No. 127-13. He cites the transcript in his proposed findings of fact, including the excerpt reflecting the facts Judge Stadtmueller found. Dkt. No. 129 at ¶36. That evidence supports the plaintiff's contention that according to Vagnini, MPD did not train on how to recover drugs or how to extract drugs from someone's pants. It also proves that Vagnini understood that he could not have skin-to-skin contact with a suspect's genitalia and that to do so would constitute an illegal strip search. <u>Id.</u>

The plaintiff asserts that in <u>Newman</u>, Officer Knight "also stated that he was not taught by his superiors the proper method for pat down searches and believed Vagnini's way was proper." Dkt. No. 126 at 16 (citing <u>Newman</u>, 2016 WL 6090859, at *4. As the court's quote from <u>Newman</u> demonstrates, this is not an accurate recitation of Judge Stadtmueller's findings as to Knight's testimony; in Judge Stadtmueller's decision, there is no mention of Knight referencing Vagnini's "way" of conducting pat down searches (or of mentioning Vagnini at all). The plaintiff provided an excerpt of Knight's deposition testimony from 2014; he said that in searching for drugs, he went between

33

layers of clothing to manipulate a person's buttocks or genitals, with no skin-to-skin contact.

Even if Judge Stadtmueller made factual findings in <u>Newman</u> that are relevant in the instant case, Judge Stadtmueller *granted* the <u>Newman</u> defendants' motion for partial summary judgment. <u>Newman</u>, 2016 WL 6090859, at *7. Judge Stadtmueller concluded,

> Newman has not shown that the strip search issue was obvious at the outset of Flynn's proactive policing program. Further, Newman has not disputed that Flynn was unaware of the strip search issue until well after he was allegedly subjected to an improper strip search. Thus, he cannot maintain a *Monell* claim against the City for failure to train or supervise the Officer Defendants prior to their alleged constitutional violation.

<u>Id.</u> The plaintiff is under the misimpression that Judge Stadtmueller *denied* summary judgment in <u>Newman</u>. Dkt. No. 126 at 4 ("In denying the City of Milwaukee and defendants' motion for summary judgment, Judge Stadtmueller found . . . ."). After making detailed factual findings—many similar or identical to facts before this court—Judge Stadtmueller *granted* summary judgment in favor of the City on the <u>Monell</u> claim. Yet the plaintiff repeatedly cites <u>Newman</u> in support of his request that this court deny the defendants' request for summary judgment in this case.

Finally, the plaintiff references the 2017 lawsuit, <u>Collins v. Milwaukee</u>, Case No. 17-cv-234-JPS (E.D. Wis.). Dkt. No. 126 at 5. The second paragraph in the complaint in that case states:

> Since 2008, Defendant City of Milwaukee ("City" or "Milwaukee"), through the MPD, has engaged in an unlawful policy, practice, and custom of conducting a high-volume, suspicionless stop-and-frisk program. This program authorizes MPD officers to stop people

34

without objective and articulable reasonable suspicion of criminal conduct, and to frisk people without reasonable suspicion that the person is armed and dangerous, as required under the Fourth Amendment. Under this program, the MPD also conducts pervasive stops and frisks that are motivated by race and ethnicity in violation of the Fourteenth Amendment and Title VI.

Id. at Dkt. No. 1, ¶2. The plaintiff asserts that "expert evidence" in Collins "showed that Milwaukee police conducted hundreds of thousands of pedestrian and traffic stops between 2010 and 2017 without reasonable suspicion." Dkt. No. 126 at 5 (citing Collins, 17-cv-234 at Dkt. 54). The Collins case was settled; as far as the court can tell, there were no judicial decisions ruling on motions to dismiss or summary judgment motions. The order the plaintiff cites is a ruling on a discovery dispute. It makes no mention of expert evidence of thousands of stops. The court has no expert evidence before it and there are no decisions from Collins that would have any arguable preclusive effect.[6]

The court also notes that the plaintiff (who admittedly was representing himself when he filed the complaint) did not claim in the complaint that the defendants' actions were based on his race or ethnicity. The complaint does not identify the plaintiff's race.

The plaintiff attached other documents to his counsel's declaration in opposition to summary judgment. He attached this court's decision in Moore v.

---

[6] The defendants argued in reply that the plaintiff had not asserted the doctrine of offensive collateral estoppel—issue preclusion. Dkt. No. 131 at 3 (citing Michelle T. v. Crozier, 173 Wis.2d 681, 697 (Wis. 1993). The defendants are correct. The court has assumed that the plaintiff was not seeking to assert form estoppel, but was making a pragmatic argument that if one judge on the court had found a fact, another judge ought to make the same finding. Regardless, the plaintiff has neither pled nor demonstrated the elements of estoppel.

35

<u>Vagnini</u>, Case No. 14-cv-1446-pp (E.D. Wis.), Dkt. No. 2, dismissing a complaint against Vagnini that alleged a 2008 search and sexual assault by Vagnini. Dkt. No. 127-1. It is not clear how this decision supports the plaintiff's position. While the plaintiff in <u>Moore</u> reported the incident to police, there is no indication in the order of dismissal (dismissing the case because it was time-barred) that the report of the incident made its way to the Internal Affairs Division or Flynn or anyone in command.

The plaintiff also attached an August 15, 2014 order from Judge Adelman in <u>Ashford v. City of Milwaukee</u>, Case No. 13-C-0771 (E.D. Wis.), in which Judge Adelman granted the motion of twelve defendants to intervene; the intervenors were "all African American men who allege that they were subjected to illegal strip and body-cavity searches by members of the Milwaukee Police Department." Dkt. No. 127-12. This order provides no information about when the intervenors were searched; the order does not constitute evidence that the city was aware of a pattern of illegal strip searches prior to the May-July 2011 period.

The plaintiff attached the police reports from Newman's arrest. Dkt. No. 127-14. Along with the arrest reports, there are what appear to be file jacket covers for over forty "SIS" files, apparently for complaints against Vagnini. Dkt. No. 127-14. The plaintiff cites to these jacket covers, stating that "Vagnini participated in at least 50 illegal strip and body cavity searches as a member of the MPD District 5 proactive Power Shift Unit that was Supervised by Sergeant Jason Mucha," dkt. no. 129 at ¶37, and that "Vagnini received at least 47

36

citizen complaints alleging illegal body cavity and strip searches. All of Vagnini's victims were African-American," dkt. no. 129 at ¶38. Assuming that these documents are manila folders containing complaints against Vagnini, the court notes that all but two of the covers bear 2012 SIS case numbers. One bears SIS Case #2010-0016, dkt. no. 127-14 at 16, and one bears SIS Case #2011-0028, dkt. no. 127-14 at 15. All the other jackets have SIS case numbers starting with 2012. This is consistent with Salazar's affidavit, which indicates that he opened an IAD investigation into Vagnini in 2012, after received the two January 31, 2012 complaints from the Fire and Police Commission. Several of the reports involve complaints filed *after* the dates of the incidents the plaintiff describes. These jacket covers do not constitute evidence that Flynn or anyone at the command level was aware of a pattern of illegal searches by Vagnini prior to the May-July 2011 time frame.

Finally, the plaintiff attached an October 9, 2007 "Use of Force Report" from Sergeant Gregory Flores, detailing an incident he investigated in which Vagnini and another officer stopped an individual, patted him down and Vagnini claimed to have felt an unknown object in the rear of the suspect's pants. Dkt. No. 127-15. The plaintiff cites this report as evidence that Vagnini participated in at least fifty illegal strip and body cavity searches. Dkt. No. 129 at ¶37. The suspect's name and identifying information have been redacted. The document reflects that as part of his investigation, Flores interviewed the suspect, who said, "He was digging in my ass, that's why I reached back. I aint got nothing more to say to you." Dkt. No. 127-15 at 4. When Flores asked the

suspect to whom he was referring, the suspect refused to answer. Id. This
document constitutes evidence that in the fall of 2007, an MPD sergeant
investigated an incident involving an alleged use of force and that the suspect
described an event similar to one of the searches the plaintiff has described in
this case. This investigation occurred before Flynn became chief and does not
constitute evidence that Flynn or the City were aware, at the policy-making
level, of this event during the May-July 2011 period.

The plaintiff asserts in his opposition brief that "[i]t is unclear why
Defendants have moved for summary judgment to dismiss Ed Flynn as a
defendant, despite prior judicial determinations that the City of Milwaukee and
Chief Flynn knew about the illegal strip searches and conduct of many of the
same defendant officers here, and that the City and Flynn turned a blind-eye to
such conduct." Dkt. No. 126 at 6. He asserts that "[t]he City and Flynn's sordid
history of the strip searches does not get better with time; it just gets old that
the City continually moves for summary judgment when it (and its attorneys)
are aware of prior court decisions in this very district." Id.

The court decisions to which the plaintiff refers are not judicial
determinations that the City of Milwaukee and Flynn knew about the illegal
strip searches and conduct *before* the searches of which the plaintiff
complains. The evidence in this court shows that Vagnini perceived from the
2008 press conference that he and other officers were expected to be
"proactive," to make stops and be visible. It shows that Vagnini denies having
been trained in how to recover drugs from a suspect's pants. It shows that

38

Vagnini testified that he did not recall arresting or searching the plaintiff. It shows that David Salazar, in his role as head of IAD, did not begin to suspect a pattern in Vagnini's behavior until January 31, 2012, did not report that pattern to the DA's office until February 2012 and did not brief Flynn until March 2012, at which time Vagnini and other members of the Power Shift Unit were suspended. While subsequent investigation confirmed a pattern of behavior on Vagnini's part and while Vagnini and others subsequently were prosecuted criminally, the plaintiff has not presented evidence that, at the time of the events the plaintiff described, the City and/or Flynn knew of a pattern of conduct that resulted in constitutional violations but were deliberately indifferent to that conduct.

The court will grant the defendants' motion and dismiss the official capacity claim.

> 2. *Individual Capacity*

Although conceding that Flynn was not present on any of the occasions when he was stopped and searched, he asserts that Flynn should be held responsible in his individual capacity because "[t]here is little doubt that Flynn had knowledge of the misconduct being carried out by the officers under his command." Dkt. No. 126 at 9.

Just as a municipality may not be held responsible for the individual actions of its employees, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). To proceed on his claim

39

against Flynn because of his position as the Chief of Police, the plaintiff must show that Flynn, through his "own individual actions, has violated the Constitution." Id. The plaintiff must show that Flynn "kn[e]w about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what [he] might see." Sanville v. McCaughtry, 266 F.3d 724, 740 (7th Cir. 2001).

The plaintiff again relies on Bohannon and Neman in support of this argument. The court already has discussed why Judge Stadtmueller's decisions do not support the plaintiff's position. The record evidence—Salazar's affidavit, as well as Judge Stadtmueller's findings in Newman—shows that Flynn was not aware of Vagnini's pattern of conduct until March 2012, at least eight months after the searches the plaintiff describes. As the court has stated, even if Flynn instituted a policy of "proactive" policing and encouraged officers to conduct more stops and more searches, there is no evidence that he instructed officers to conduct illegal or assaultive searches like the ones the plaintiff describes, or that he was aware of and turned a blind eye to or condoned such searches.

Flynn is entitled to judgment as a matter of law on the plaintiff's individual capacity claim and the court will grant Flynn's motion on that claim.

C.   Conspiracy Claim

The plaintiff asserts that his conspiracy claim "is properly before the court." Dkt. No. 126 at 11. But courts decide whether a plaintiff has properly pled a claim at screening or when deciding a motion to dismiss under Federal

40

Rule of Civil Procedure 12. The question at summary judgment is whether there is a genuine dispute of material fact that, if resolved in the plaintiff's favor, would allow a reasonable jury to find in favor of the plaintiff.

Conspiracy is not an independent basis of liability under §1983. Smith v. Gomez, 550 F.3d 613, 617 (7th Cir. 2008) (citing Cefalu v. Vill. of Elk Grove, 211 F.3d 416, 423 (7th Cir. 2000). It creates a source of liability only if the plaintiff can show that he suffered an underlying constitutional injury. Kelley v. Myler, 149 F.3d 641, 648 (7th Cir. 1998). The defendants do not seek summary judgment on the underlying violations—the searches that Vagnini purportedly conducted and in which Knight purportedly assisted. Because the underlying violations are uncontested, the court considers the plaintiff's claim that Cline, Martinez and Kuspa conspired with Vagnini and Knight to commit the constitutional injuries.

To prove a conspiracy claim, the plaintiff must show "(1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." Beaman v. Freesmeyer, 776 F.3d 500, 510 (7th Cir. 2015). Put differently, the plaintiff must "show an underlying constitutional violation" and "demonstrate that the defendants agreed to inflict the constitutional harm." Hurt v. Wise, 880 F.3d 831, 842 (7th Cir. 2018). The plaintiff may use circumstantial evidence to establish the existence of a conspiracy, "but such evidence cannot be speculative." Beaman, 776 F.3d at 511; see Daugherty v. Page, 906 F.3d 606, 612 (7th Cir. 2018) (dismissing conspiracy claim against prison officials

because plaintiff failed to provide evidence "of an agreement to deprive him of his constitutional rights" and based his claim "on mere speculation").

The defendants assert that the plaintiff cannot succeed on his conspiracy claims because the defendants were state employees at the time of the searches, barring the plaintiff's claim under the "intracorporate conspiracy doctrine." Dkt. No. 120 at 7. Under that doctrine, "a 'conspiracy cannot exist solely between members of the same entity.'" Beese v. Todd, 35 F. App'x 241, 243 (7th Cir. 2002) (quoting Payton v. Rush–Presbyterean–St. Luke's Med. Ctr., 184 F.3d 623, 632 (7th Cir. 1999)). The Court of Appeals for the Seventh Circuit has applied the doctrine to dismiss a conspiracy claim brought under 42 U.S.C. §1985 against members of the Wisconsin Department of Corrections. See Beese, 35 F. App'x at 243. But the Seventh Circuit has not extended the doctrine to cases under §1983. Other courts in this circuit have noted that "it makes sense that the doctrine will rarely, if ever, apply in police misconduct cases" where the plaintiff alleges that the officers were acting, not in the interests of the police department, but on their own personal biases. Emery v. Ne. Ill. Reg'l Commuter R.R. Corp., No. 02 C 9303, 2003 WL 22176077, at *4 (N.D. Ill. Sept. 18, 2003) (citing Newsome v. James, No. 96 C 7680, 2000 WL 528475, at *15 (N.D. Ill. Apr. 26, 2000)). The plaintiff has not responded to this argument, and the defendants assert he has waived any opposition. Dkt. No. 131 at 6–7 (citing cases).

Because the plaintiff's allegations of police misconduct arise under §1983, it is not clear whether the intracorporate conspiracy doctrine may

Case 2:16-cv-00662-PP    Filed 03/24/21    Page 42 of 45    Document 134

apply, so the court will not accept the defendants' invitation and find that the plaintiff has conceded that point. See Dkt. No. 131 at 607. What is clear is that plaintiff has failed to provide evidence from which a reasonable jury could conclude that the officers agreed to violate his rights. The only information the plaintiff cites to oppose the defendants' argument for dismissal are paragraphs from his complaint, which state his legal claim but do not constitute evidence that a conspiracy existed. Dkt. No. 126 at 11–13. He has not identified evidence in the record suggesting that the officers agreed to search him illegally or to assist Vagnini in conducting the allegedly illegal searches. That the officers worked together on the Power Shift Unit on the dates of the allegedly illegal searches does not prove that they agreed to violate the plaintiff's rights by using improper pat-down techniques. Nor is it enough that Officers Cline, Martinez and Kuspa were present when Vagnini conducted the illegal searches. The plaintiff must show evidence that they agreed *beforehand* to violate his rights. He has failed to do so.

If the court were considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the plaintiff's reference to the complaint in support of his argument that he properly pled the conspiracy claim might prevail. It is not enough to defeat a motion for summary judgment.

The plaintiff also urges the court to remember that when he filed his complaint, he was representing himself. Dkt. No. 126 at 12. He asserts that even as a layman, he sufficiently has alleged a claim that Knight, Cline, Martinez and Kuspa failed to intervene to prevent Vagnini's unlawful conduct.

43

Id. Again, the court is not ruling on a motion to dismiss for failure to state a claim. The plaintiff has pointed to no *evidence* that supports a claim for failure to intervene. He says only that Knight, Cline, Martinez and Kuspa were "near" or "present" when Vagnini allegedly violated the plaintiff's rights. Dkt. No. 126 at 13. As the plaintiff himself concedes, to prove a claim of failure to intervene, he must point to evidence showing that the defendants knew that Vagnini was committing a constitutional violation and that they had a realistic opportunity to prevent it. Gill v. City of Milwaukee, 850 F.3d 335, 342 (7th Cir. 2017). The plaintiff has presented no evidence on either of these elements.

The court will grant summary judgment to Officers Cline, Martinez and Kuspa and dismiss the conspiracy claim.

D.    Officer Busshardt

The plaintiff does not dispute that Officer Busshardt was not personally involved in any of the searches or arrests. The plaintiff concedes that his claim against Busshardt is insufficient to establish Busshardt's person involvement and that Busshardt should be dismissed. Dkt. No. 126 at 10. The court will grant summary judgment in favor of Busshardt and dismiss him as a defendant.

**III.    Conclusion**

The court **GRANTS** the defendants' motion for partial summary judgment. Dkt. No. 119.

The court **DISMISSES** defendants Flynn, Norman, Cline, Martinez, Kuspa and Busshardt.

The court **DISMISSES** the plaintiff's <u>Monell</u> claim.

The court will enter a separate order setting a status conference to discuss the next steps.

Dated in Milwaukee, Wisconsin this 24th day of March, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**